UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK[1]

| | |
|---|---|
| MARY FRANCES WAGLEY, JAMES WAGLEY, ANNE WAGLEY, and MARY COPP, as beneficiaries of the MARY PENNEY WAGLEY IRREVOCABLE TRUST, | No. 18-cv-08668 (PGG) |
| Plaintiffs, | **AMENDED COMPLAINT** |
| - against – | **<u>JURY TRIAL DEMANDED</u>** |
| JPMORGAN CHASE BANK, N.A., as trustee of the MARY PENNEY WAGLEY IRREVOCABLE TRUST, KELLY ADAMS, J.P. MORGAN SECURITIES LLC, J.P. MORGAN INVESTMENT MANAGEMENT INC., JPMORGAN DISTRIBUTION SERVICES, INC., and JPMORGAN CHASE & CO., | |
| Defendants. | |

---

[1]  Plaintiff has captioned this Amended Complaint using a federal-court caption only because this action has been removed to the United States District Court for the Southern District of New York.  Plaintiff intends to file a motion to remand this action to the Supreme Court of the State of New York.  The federal-court caption should not be construed as a waiver of Plaintiffs' arguments that removal was improper, and that this Court lacks subject matter jurisdiction over this action.

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................ 1

PARTIES ......................................................................................................... 11

JURISDICTION AND VENUE .......................................................................... 12

FACTUAL ALLEGATIONS .............................................................................. 13

   I.   JPMORGAN'S ASSET MANAGEMENT BUSINESS ENGAGED IN SYSTEMIC MISCONDUCT DIRECTED AT THE PUBLIC ............................... 13

     A.   JPMCB Had a Motive and Opportunity to Steer Assets of Ordinary Clients Into Transactions Where Its Interests Were Conflicted ........................ 13

     B.   JPMCB Admitted to the Securities Exchange Commission That It Maintained an Undisclosed Practice of Self-Dealing Using Client Assets ........................... 15

     C.   JPMCB's Self-Dealing Mismanagement of Client Assets Has Dealt Widespread Losses to Ordinary Investors ......................................................... 18

   II.   JPMCB BREACHED ITS FIDUCIARY DUTIES TO PLAINTIFFS AND COMMITTED OTHER WILLFUL WRONGDOING ....................................... 22

     A.   JPMCB Failed to Comply with the Prudent Investor Rule ................................ 22

     B.   JPMCB Engaged in Self-Dealing by Investing in Proprietary Funds and Receiving Kickbacks in Return for Investments of Plaintiffs' Property ...................... 25

     C.   JPMCB's False Representations and Inadequate Disclosures Breached Its Fiduciary Duties to Plaintiffs ........................................................................... 31

     D.   JPMCB's Breach of its Fiduciary Duty, Self-Dealing, and Imprudent Investing Injured Plaintiffs ............................................................................ 38

   III.   PLAINTIFFS' CLAIMS ARE TIMELY ............................................... 38

     A.   No Limitations Period Can Begin Until JPMCB's Removal as Trustee ............ 38

     B.   Inquiry Notice, Equitable Tolling, and Fraudulent Concealment ....................... 39

FIRST CAUSE OF ACTION ............................................................................. 41

SECOND CAUSE OF ACTION ......................................................................... 44

THIRD CAUSE OF ACTION ............................................................................ 46

PRAYER FOR RELIEF ................................................................................... 47

DEMAND FOR JURY TRIAL .......................................................................... 47

Plaintiffs Mary Frances Wagley (**"Mary Frances"**), James Wagley (**"Wagley"**), Anne Wagley, and Mary Copp, beneficiaries of the Mary Penney Wagley Irrevocable Trust (the **"Penney Trust"** or the **"Trust"**) (collectively, **"Plaintiffs"**), by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, bring this action and allege as follows:

## NATURE OF THE ACTION

*Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.[2]*

*Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, C.J.)

1.      On April 14, 1902, James Cash Penney, known as "J. C. Penney," established a dry goods store called the Golden Rule in the small town of Kemmerer, Wyoming, in a one-room wooden building with an attic that provided living quarters for his family. From these modest origins, Penney built what became one of the largest retail businesses in the United States, operating 1,000 department stores throughout the country by 1928. The J. C. Penney Company was listed on the New York Stock Exchange the following year – only days before the stock market crash and the ensuing Great Depression, which battered the fortunes of Penney and the company that bore his name. As the J. C. Penney Company and the nation's economy embarked on their gradual recovery in the years that followed, Penney set up several trusts with the aim of protecting his family in future hard times. Penney established one of these trusts, the Penney Trust, for the

---

[2]  Internal citation omitted.

1

benefit of his young daughter, Mary Frances, pursuant to a Trust Agreement with Chemical Bank & Trust Co. (**"Chemical Bank"**) dated December 28, 1934 (the **"Trust Agreement"**). Penney gave Chemical Bank the discretion to select investments on behalf of his daughter based on his trust in and enduring relationship with the bank, which persevered through the Great Depression and subsequent decades. Penney also believed in giving back, and created endowed trusts or otherwise contributed significantly to organizations such as the National 4-H Council, the Methodist Church, the University of Missouri, Stanford University, and the Massachusetts Institute of Technology.

2.      In 1996, having grown to become the third largest bank in the United States in terms of total assets, Chemical Bank acquired the Chase Manhattan Corporation and adopted its brand. The combined company acquired J.P. Morgan & Co. soon after, in 2000. As a result of these mergers and acquisitions, the Penney Trust is now administered by Defendant JPMorgan Chase Bank, N.A. (**"JPMCB"**) as Trustee. Since 2009, at the request of Mary Frances, JPMCB has managed and formally administered the Penney Trust out of its offices in Dallas, Texas, where Plaintiff James Wagley resides. Wagley has served as the Trust beneficiaries' designated point of contact with JPMCB since Mary Frances, now a nonagenarian, entered her golden years.

3.      Throughout this time, Penney's descendants maintained their trust in Chemical Bank and its successor entities. They provided JPMCB with the same mandate as they had previously given Chemical Bank, namely, to pursue the long-term growth of the principal value of the Penney Trust, with the objective of building an enduring family legacy.

4.      In recent years, however, JPMCB has impermissibly allowed other objectives to compete with those of the Penney family and the best interests of the Penney Trust. In its quest to make up for lost earnings following the 2008-2009 financial crisis, JPMCB's parent company,

Defendant JPMorgan Chase & Co. (**"JPMC"** and together with its affiliated entities, **"JPMorgan"**) directed its sprawling asset management business to systematically steer the assets of captive clients such as Plaintiffs into unsuitable, self-dealing transactions that enriched JPMorgan to the detriment of its clients' wealth and JPMorgan's fiduciary obligations.

5.      A former JPMorgan employee involved in the management of the Penney Trust has told the family that the Trust's case is ***"heartbreaking"*** and was caused by JPMorgan's policy of over-investing clients' funds in costly, proprietary products.  The former employee explained that the lucrative fees these products generated for JPMorgan necessarily exerted a continuing "drag" on its clients' investment returns, creating a classic conflict of interest.  Under JPMCB's failed stewardship, the growth of the Penney Trust has consistently lagged far behind the returns achieved by comparable Penney family endowments and widely recognized market benchmarks, such as the Standard & Poor's 500 (**"S&P 500"**) index of large, publicly listed companies.  As of the present date, the Penney Trust's underperformance has accumulated into a shortfall of millions of dollars of principal value.

6.      Plaintiffs, the beneficiaries of the Penney Trust, were not the only fiduciary clients to be let down by JPMorgan during that period.  In early 2015, *Bloomberg* reported that ordinary JPMorgan clients such as a public library in Canton, Illinois and Episcopal churches in Indiana and West Virginia have ***lost millions of dollars*** because JPMorgan improperly placed their assets in speculative, unsuitable products from which it received hefty management fees and other revenues.  One such product was the failed Highbridge Dynamic Commodities Strategy Fund, which "had no performance history and Morningstar's lowest rating when JPMorgan trustees put about $750,000 from the library trust there" – a stake that it eventually sold in March 2013 at a

loss of $254,000.[3]   JPMorgan's culture of self-dealing likewise led Penney Trust assets to be squandered on this and other in-house investment products that benefited the bank to its clients' detriment.   No fiduciary or reasonably prudent investor would have allocated trust assets on such a massive scale into such a risky and untested product.   But JPMorgan had an apparently irresistible motive to funnel the assets of the Penney Trust and other fiduciary clients into this failed investment: JPMorgan stood to reap hefty management fees as the owner of Highbridge Capital Management, LLC (**"Highbridge"**), which JPMC's subsidiary J.P. Morgan Asset Management Holdings Inc. (**"JPMAMH"**) completed its acquisition of in 2009.[4]   "The benefit to JPMorgan is clear," as the *New York Times* explained.   "The more money investors plow into the bank's funds, the more fees it collects for managing them."[5]

7.     Even when JPMorgan was not placing clients' assets into unsuitable products such as the Highbridge funds, its asset managers systematically preferred proprietary funds, from which JPMorgan would earn exorbitant fees, over more cost-effective products offered by unaffiliated third parties.   These and other self-dealing transactions affecting JPMorgan's fiduciary clients were so pervasive that they even infected the management of the bank's own 401(k) savings plan, according to class-action lawsuits proceeding in the Southern District of New York.[6]

8.     JPMCB and its broker-dealer affiliate Defendant J.P. Morgan Securities LLC (**"JPMS"**) ***have admitted*** as much as part of landmark settlements with the U.S. Securities and

---

[3]  Neil Weinberg, *Losing Faith in JPMorgan, Two Churches Claim Self-Dealing*, BLOOMBERG (Jan. 9, 2015), https://www.bloomberg.com/news/articles/2015-01-08/losing-faith-in-jpmorgan-two-churches-claim-self-dealing.
[4]  DealBook, *JPMorgan to Acquire Rest of Highbridge Capital*, N.Y. TIMES (June 11, 2009), https://dealbook.nytimes.com/2009/06/11/jpmorgan-to-buy-out-highbridge-capital.
[5] Susanne Craig & Jessica Silver-Greenberg, *Former Brokers Say JPMorgan Favored Selling Bank's Own Funds Over Others*, N.Y. TIMES (July 2, 2012), https://dealbook.nytimes.com/2012/07/02/ex-brokers-say-jpmorgan-favored-selling-banks-own-funds-over-others.
[6]  *See* Greg Iacurci, *J.P. Morgan Sued for Self-Dealing in Its 401(k) Plan*, PENSIONS & INVESTMENTS (Jan. 27, 2017), http://www.pionline.com/article/20170127/ONLINE/170129874/jp-morgan-sued-for-self-dealing-in-its-401k-plan.

Exchange Commission and the Commodity Futures Trading Commission made public on December 18, 2015 (the **"SEC Order"**).   Specifically, JPMorgan acknowledged engaging in an undisclosed, years-long practice of corralling its unwitting clients' assets into JPMorgan-managed funds or into third-party funds in exchange for unseemly kickbacks known euphemistically as "retrocessions."[7]   The Securities and Exchange Commission's head of enforcement found that "***undisclosed conflicts were pervasive***" at JPMorgan, which agreed to pay $307 million to resolve its admitted wrongdoing.[8]   In the wake of the Securities and Exchange Commission's investigation, JPMorgan moved large amounts of fiduciary assets out of costly proprietary funds, such as the JPMorgan Mid Cap Growth and Small Cap Core funds, in which it had invested the assets of fiduciary clients such as JPMorgan's 401(k) plan beneficiaries.[9]

9.      By the time regulators exposed the pervasive misalignment of incentives and systematic mismanagement of client assets within JPMorgan, the bank's self-dealing practices had inflicted millions of dollars of losses on Plaintiffs.   Like many other victims of the misconduct detailed in the SEC Order, the Penney Trust's assets were placed in proprietary products such as the Highbridge Dynamic Commodities Strategy Fund and the JPMorgan Large Cap Core Fund, among many others.   JPMCB also placed Penney Trust assets in a litany of third-party funds, such as the Invesco Balanced-Risk Allocation Fund, that often "pay the intermediary ['such as a bank'] for the sale of Fund shares," *i.e.*, retrocessions, and may thereby "create a conflict of interest by influencing the broker-dealer or other intermediary" in regards to the placement of clients' funds.[10]

---

[7]   *JPMorgan Chase Bank, N.A. & J.P. Morgan Sec. LLC, Respondents.*, Investment Advisers Act of 1940 Release No. 4295, 113 SEC Docket 26 (Dec. 18, 2015).

[8]   Nathaniel Popper, *JPMorgan to Pay $307 Million for Steering Clients to Own Funds*, N.Y. TIMES (Dec. 18, 2015), https://www.nytimes.com/2015/12/19/business/dealbook/jpmorgan-to-pay-307-million-for-steering-clients-to-own-funds.html.

[9]   Owen Davis, *JPMorgan Obliterated One of Its Own Mutual Funds By Yanking Employee 401(k) Assets*, DEALBREAKER (Jan. 26, 2017), https://dealbreaker.com/2017/01/jpmorgan-obliterated-own-mutual-fund.

[10]   Prospectus, Invesco Balanced-Risk Allocation Fund (Feb. 28, 2018), http://hosted.rightprospectus.com/Invesco/Fund.aspx?cu=00141V747&dt=P&ss=mf.

Numerous investments influenced by JPMorgan's culture of self-dealing were disposed of at a significant loss to the Penney Trust even as the stock market soared to record-high levels.  For example, in April 2013 JPMCB eventually dumped a portion of the Penney Trust's ill-fated investments in the Highbridge Dynamic Commodities Strategy Fund at a *nearly 28% loss*.

10.     As with the other clients affected by the misconduct detailed in the SEC Order, JPMCB wrongfully failed to disclose to Plaintiffs that the bank's policy was to systematically prefer investment products for which JPMorgan received management fees or kickbacks.  For example, JPMCB's sole disclosures to Plaintiffs regarding its potential or actual conflicts of interest prior to 2014 was the following language, appearing in fine print at the very end of the Penney Trust's annual account statement for 2013, or language substantially similar to it:

> J.P. Morgan affiliates may receive compensation from the JPMorgan funds for providing investment advisory services to the funds.  J.P. Morgan affiliates may also provide administrative, custodial, sales, distribution, shareholder or other services to the JPMorgan Funds or funds established, sponsored, advised, or managed by third parties, and J.P. Morgan affiliates may be compensated for such services as allowed by applicable law.  The distributor of the JPMorgan Funds is JPMorgan Distribution Services, Inc., which is an affiliate of JPMCB.

As JPMCB and JPMS admitted to the SEC and the CFTC, this boilerplate disclosure was materially misleading at the time it was made: it fails to disclose JPMorgan's bank-wide policy of funneling captive clients' assets into JPMorgan's in-house investment products, or its practice of directing business to third parties in exchange for kickback payments.

11.     Following the commencement of the Securities and Exchange Commission's investigation of JPMorgan, the bank updated its standard-form disclosures with fine print acknowledging the *possibility* of conflicts of interest, but even these disclosures were false when made: they misleadingly suggested that JPMCB would prefer proprietary investments *only on the margin*, *i.e.*, where its in-house products were substantially identical to those managed by third parties.  In fact, JPMCB's policy was to *systematically compromise its investment process* in favor

of the bank's own financial interests. JPMCB also failed and has continued to refuse to specifically identify the transactions corrupted by retrocessions and other conflicts of interest. JPMCB's misleading disclosures concealed the corruption of its investment process from Plaintiffs, who remained unaware of JPMCB's misaligned incentives, its policy of self-dealing, and the resulting impact on the Penney Trust.

12.     JPMCB's mismanagement of the Penney Trust was not limited to the misconduct detailed in the SEC Order. The bank's policy of prioritizing its own revenues over the best interests of its fiduciary clients drove other misconduct, including executing an extraordinarily and unjustifiably high volume of trades on behalf of the Penney Trust. By 'churning' the trust's investments, JPMCB's trading activity inflicted ongoing and accumulating losses on the Penney Trust's principal value while generating commissions and other revenues for the bank. These trades included numerous speculative, short-term bets on derivatives and other leveraged and highly volatile instruments that were not suitable for the Penney Trust's investment objectives and frequently incurred breathtaking losses. For example, in March 2015, JPMCB liquidated a speculative oil trade for a ***short-term loss in excess of 50%***. JPMCB undertook transactions of this nature and volume, which bore no relationship to the Penney Trust's investment objectives, in a reckless and deceitful bid to drive revenues for the bank at unjustifiable risk to Plaintiffs.

13.     The inevitable result of JPMCB's incompetent and self-dealing conduct as Trustee of the Penney Trust was to waste trust property and cost Plaintiffs millions of dollars. The extent of the damage is evident in the grave underperformance of the Penney Trust relative to comparable family endowments. Between 2000 and 2015, the Penney Trust has not grown but rather has ***lost nearly 9% of its principal value***. In contrast, a Penney family trust with the investment management firm Brown Advisory (the **"Brown Advisory Trust"**), for which Plaintiffs provided

7

instructions similar to those given to JPMCB, grew in principal value by ***more than 58%***, or nearly $3.4 million.[11]  A Penney family-endowed chair at the Massachusetts Institute of Technology (the **"MIT Penney Chair"**) likewise gained ***59%*** between 2000 and 2015.  In sum, the Penney Trust has seen its principal value dwindle under JPMCB's stewardship even as the Brown Advisory Trust and the MIT Penney Chair have grown by millions of dollars:



14.     As demonstrated by the chart below, the chasm between the performance of the Penney Trust and the Brown Advisory Trust has only grown since JPMorgan's Dallas, Texas office took over administration of the Penney Trust in 2009.

---

[11]   A Penney family-endowed chair at the Massachusetts Institute of Technology (the **"MIT Penney Chair"**) likewise gained **$4.3 million** in principal value over the same period.



In 1995, the principal value of the Penney Trust exceeded that of the Brown Advisory Trust by nearly $800,000.  By mid-2018, as a result of JPMCB's systematic mismanagement, the value of the Penney Trust had fallen behind the Brown Advisory Trust by ***approximately $8 million***.

15.     Plaintiffs have made repeated reasonable inquiries regarding the Penney Trust's poor performance to the responsible fund managers at JPMCB and have consistently reiterated their instruction to prioritize long-term principal growth.  JPMCB has represented to and assured Plaintiffs that the bank, as a fiduciary, has acted in a manner consistent with Plaintiffs' directives and exercised "extensive due diligence" in selecting investments for the Penney Trust.  Despite the revelations in the SEC Order and the accumulating evidence that the Penney Trust fell prey to self-dealing and other misconduct by JPMCB, JPMCB has stonewalled Plaintiffs' efforts to hold the bank to account for its fiduciary breaches and the ill-gotten advantages it has gained as a result.  Plaintiffs specifically asked on many occasions for a detailed accounting of the fees being charged.  JPMCB was always evasive in their reply.  When Plaintiffs requested information about the Penney Trust's performance and JPMCB's fees in early 2015, JPMCB would not report back with substantive information for nearly two weeks at a time.  When Plaintiffs formally demanded

in 2016 that the bank identify and fully disclose the entirety of its self-dealing and conflicted transactions, JPMCB's responses were dilatory, evasive, and dishonest.

16.     JPMCB has been craven in its efforts to evade accountability.  In February 2009, following the innocuous request by Mary Frances that JPMorgan transfer the Trust's administration to Dallas, Texas, JPMCB drafted a self-serving letter for Mary Frances to sign, praising "the care and management you [JPMorgan] have given my trust . . . . [since] I was seven," and stating that "I have been pleased with JPMorgan."  While a key purpose of the transfer to Dallas was to facilitate greater involvement by James Wagley given his mother's old age, JPMCB continued to *circumvent both Wagley and Plaintiffs' counsel*, instead directing highly material communications to Wagley's *nearly 90-year-old mother*.  For example, on January 20, 2017, after Plaintiffs formally demanded an accounting from JPMCB, Defendant Kelly Adams notified Mary Frances alone that "[w]hile preparing the accounting to file with the Court, we discovered that we incorrectly charged fees to the Trust" totaling *$188,245.72*, and announced that this amount would be added to her quarterly distribution check.  This was a troubling admission given JPMCB's representation that it never received fees from the Trust over and above trust management fees,[12] and JPMCB's decision to notify only Mary Frances, then 89 years old, was an inexcusable attempt to evade the attention of both Wagley and Plaintiffs' counsel.

17.     This lawsuit seeks to recover Plaintiffs' damages and hold JPMorgan and Adams to account for their impermissible conduct in connection with the administration of the Penney Trust and the ill-gotten benefits JPMorgan extracted to the detriment of Plaintiffs.  Plaintiffs should be awarded punitive damages and attorney's fees based on the sprawling scale of JPMorgan's

---

[12]   Even this figure does not include the indirect fee income, retrocessions, and other advantages that JPMorgan wrongfully obtained from its role as Plaintiffs' fiduciary, and has refused to disclose to Plaintiffs.

misconduct towards the investing public.  Plaintiffs bring this action for: breaches of fiduciary duties; aiding and abetting breaches of fiduciary duties; and unjust enrichment and restitution.

## **PARTIES**

18.     Plaintiffs Mary Frances Wagley, James Wagley, Anne Wagley, and Mary Copp are individual beneficiaries of the Penney Trust.

      a.  Mary Frances resides in Cockeysville, Maryland.

      b.  James Wagley resides in Dallas, Texas.

      c.  Anne Wagley resides in Berkeley, California.

      d.  Mary Copp resides in Westport, Massachusetts.

19.     Defendant JPMorgan Chase Bank, N.A., is a nationally charted bank with its principal place of business in New York, New York and its main office in Columbus, Ohio.  Since 2009, JPMCB has administered the Penney Trust from its offices in Dallas, Texas.  JPMCB is a direct, wholly owned subsidiary of JPMC, and is an indirect successor to Chemical Bank.

20.     Defendant Kelly Adams is an individual residing in Ellis County, Texas.  She is a Vice President at JPMCB and is the T & E Officer in charge of administering the Penney Trust.

21.     Defendant J.P. Morgan Securities LLC is a registered broker-dealer and investment adviser organized under the laws of Delaware with its principal place of business located in New York, New York.  JPMS is an indirect, wholly owned subsidiary of JPMC.  The LLC membership of JPMS includes J.P. Morgan Broker-Dealer Holdings Inc., an indirect, wholly owned subsidiary of JPMC having its principal place of business in New York, New York.

22.     Defendant J.P. Morgan Investment Management Inc. (**"JPMIM"**) is a registered investment adviser organized under the laws of Delaware with its principal place of business located in New York, New York.  JPMIM is an indirect, wholly owned subsidiary of JPMC.

23.     Defendant JPMorgan Distribution Services, Inc. (**"JPMDS"**) is a registered broker-dealer organized under the laws of Delaware with its principal place of business located in Columbus, Ohio.  JPMDS is an indirect, wholly owned subsidiary of JPMC. JPMDS maintains a broker-dealer license in New York, regularly conducts business in New York with entities located in New York, including JPMCB and JPMIM, and has previously been sued in New York.

24.     Defendant JPMorgan Chase & Co. is a financial holding company incorporated under the laws of Delaware with its principal place of business located in New York, New York.

## JURISDICTION AND VENUE

25.     This action was filed in the Supreme Court of the State of New York, New York County, on September 14, 2018.  Jurisdiction of the New York Supreme Court was founded upon New York Civil Practice Law and Rules (**"CPLR"**) § 301 and upon CPLR § 501, pursuant to Paragraph 11 of the Trust Agreement.   Venue was proper pursuant to CPLR § 503 because JPMCB's principal office is located at 270 Park Avenue, New York, New York, 10017, and pursuant to CPLR § 509 because Plaintiffs designated New York County as the place of trial.

26.     On September 21, 2018, JPMCB removed this action to the United States District Court for the Southern District of New York on the purported grounds that removal is proper pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.  Plaintiffs intend to file a motion to remand this action back to the Supreme Court of the State of New York, New York County, where it was filed.

## FACTUAL ALLEGATIONS

I. **JPMORGAN'S ASSET MANAGEMENT BUSINESS ENGAGED IN SYSTEMIC MISCONDUCT DIRECTED AT THE PUBLIC**

    A.     **JPMCB Had a Motive and Opportunity to Steer Assets of Ordinary Clients Into Transactions Where Its Interests Were Conflicted**

27.      JPMorgan Chase & Co., Defendants' top-tier holding company, boasted in its 2015 Annual Report that "[a]t J.P. Morgan Asset Management," which managed the Penney Trust, "we have been building a client-first, fiduciary culture for more than 180 years."[13]  But the transfer of the Penney Trust's administration from New York to JPMorgan's offices in Dallas, Texas in 2009 came at a pivotal moment for the bank, which had begun to bend its fiduciary culture to the breaking point in an effort to shore up its profitability following the mortgage meltdown.  As the *New York Times* reported, "[f]acing a slump after the financial crisis, JPMorgan Chase turned to ordinary investors to make up for the lost profit."[14]  JPMorgan looked to take advantage of the sway it held over captive investors like Plaintiffs, whose assets represented a ready pool of cash to funnel into products that generated fees for the bank.  The opportunity to extract additional revenues at the expense of its fiduciary clients proved irresistible to JPMorgan, which adopted a pervasive and undisclosed policy of steering fiduciary assets into costly proprietary investments, often to the detriment of the clients JPMorgan was bound to serve.

28.      JPMorgan's practices were improper because of the obvious conflict of interest it created for JPMorgan's investment advisors and managers.  "The concern is that, driven by fees, banks will push their own products over lower-cost options with stronger returns."[15]  By

---

[13]  JPMorgan Chase & Co., *Annual Report 2015*, at 67, https://www.jpmorganchase.com/corporate/investor-relations/document/2015-annualreport.pdf.

[14]  Craig & Silver-Greenberg (July 2, 2012)

[15]  Susanne Craig & Jessica Silver-Greenberg, *Selling the Home Brand: A Look Inside an Elite JPMorgan Unit*, N.Y. TIMES (Mar. 2, 2013), https://dealbook.nytimes.com/2013/03/02/selling-the-home-brand-a-look-inside-an-elite-jpmorgan-unit-2.

systematically steering assets to JPMorgan's own products, where JPMorgan could directly or indirectly generate additional fees, JPMorgan was placing its advisors and managers in positions of conflict with the best interests of its clients and fiduciaries.  As the *New York Times* reported, "[i]t is a controversial practice, and many companies have backed away from offering their own funds because of the perceived conflicts."[16]

29.     More brazen than its competitors, JPMorgan persisted in this practice, often without making ***any*** disclosure of its self-dealing to clients and fiduciaries – until its misconduct attracted regulatory attention from the Securities and Exchange Commission.  According to the *New York Times*:

> While financial advisers at other firms are typically free to offer a variety of investments, JPMorgan pressures brokers to sell the bank's own products, according to the current and former employees. Several advisers who resisted said they were told to change their tactics or be pushed out.[17]

One former JPMorgan adviser told the *Times*, ***"We were not able to do the right things for our clients."***  He reported that "an executive told the brokers on a conference call, ***'You are not a money manager; you are an asset gatherer.'"***  Former employees of the bank described how they and/or their colleagues were terminated if they did not aggressively favor JPMorgan's own products over those of its competitors.[18]

30.     Consistent with reporting by the *Times*, a former JPMorgan employee who was ***assigned to the Penney Trust*** has informed Plaintiffs that JPMorgan personnel faced quotas and were compensated to bring in new clients, new assets, and new revenues.  This employee stated that the environment in which the Penney Trust was administered was rife with conflicts of interest: "we want to act ***for*** our clients," but ***"at JPMorgan we kept doing things to our clients."***

---

[16]   Craig & Silver-Greenberg (July 2, 2012).
[17]   Craig & Silver-Greenberg (March 2, 2013).
[18]   *Id.* (emphasis added).

Like many other clients of JPMorgan, the Penney Trust fell prey to the misaligned incentives and the resulting pervasive culture of self-dealing perpetrated by JPMorgan against its asset management clients.  As described in further detail below, this misconduct was revealed when the SEC and the Commodity Futures Trading Commission released the findings of their investigations into the bank's practices near the end of 2015.

> **B.     JPMCB Admitted to the Securities Exchange Commission That It Maintained an Undisclosed Practice of Self-Dealing Using Client Assets**

31.     While JPMorgan's misconduct was concealed from ordinary clients like Plaintiffs, who relied on the bank as their Trustee and fiduciary, its practices triggered a lengthy investigation by the SEC and the CFTC that resulted in a settlement released on December 18, 2015.  As part of the SEC Order related to private wealth clients, JPMCB and JPMS "agreed to pay $307 million to settle accusations that [they] improperly steered clients to the company's in-house mutual funds and hedge funds" and failed to disclose this practice to their customers."[19]  JPMCB ***admitted*** to a company-wide

> negligent ***failure . . . to disclose conflicts of interests*** arising from [its] preferences for (i) JPMorgan-managed mutual funds . . . (ii) JPMorgan-managed private hedge funds . . . and (iii) and third-party-managed private hedge funds that shared client fees with a [JPMorgan] affiliate.[20]

JPMorgan and JPMS were ordered to cease and desist from committing further violations and to pay disgorgement of profits gained from their wrongdoing.  In the wake of the settlement, the CFTC's director of enforcement noted that "[i]nvestors are entitled to know if a bank managing their money favors placing investments in its own proprietary funds or other vehicles that generate fees for the bank."[21]

---

[19]  Popper (Dec. 18, 2015).
[20]  *JPMorgan Chase Bank, N.A. & J.P. Morgan Sec. LLC, Respondents*, Investment Advisers Act of 1940 Release No. 4295, 113 SEC Docket 26, ¶ 1 (Dec. 18, 2015) (**"SEC Order"**).
[21]  "CFTC Orders JPMorgan Chase Bank, N.A. to Pay $100 Million for Failure to Disclose Conflicts of Interest," CFTC Release No. 7297-15 (Dec. 18, 2015), https://www.cftc.gov/PressRoom/PressReleases/pr7297-15.

32.     JPMCB's admissions to the SEC and the CFTC reveal that the bank's asset managers did not just prefer JPMorgan's own mutual funds and hedge funds on the margin – they systematically favored these investments over competitors' products.  For example, regulators found that "in early 2011, JPMCB had invested **47% of mutual fund assets** and **35% of hedge fund assets** in JPMCB IM client accounts in Proprietary Funds."[22]  JPMCB further admitted that it "failed to adequately disclose certain conflicts of interest to [its] clients,"[23] having begun to disclose the bank's self-serving preference for proprietary mutual funds and hedge funds in its account documentation no earlier than 2014.[24]  Directing clients' assets into JPMorgan's own investment products allowed JPMorgan to extract additional revenues at its clients' expense, including management fees, prime brokerage revenues, compensation for investment advisory, shareholder servicing, distribution, administrative, and other services provided to mutual funds, and other income directly or indirectly resulting from its placement of client funds in proprietary instruments.  As noted in *Forbes*, this conflict of interest was especially pronounced in the case of "hedge funds and other alternative investments," which "are far more expensive than low-cost index funds.  Alts charge fees of 2% of assets and 20% of any profits—hundreds of times higher than index fund fees of a few basis points."[25]  As such, placing client assets in these products was particularly lucrative to JPMorgan – and even costlier to JPMorgan's fiduciary clients.

33.     Besides favoring its own proprietary funds, JPMCB also admitted to the practice of steering client funds into third-party-managed hedge funds that compensated the bank's affiliates in the form of "retrocessions" or placement agent fees.  As *Forbes* explains, "[r]etrocessions are

---

[22]  SEC Order ¶ 34.
[23]  *Id.* ¶ 9.
[24]  *Id.* ¶¶ 36-37.
[25]  Edward Siedle, *JP Morgan Asset Management SEC Settlement Exposes Hedge Fund Retrocessions*, FORBES (Feb. 9, 2018), https://www.forbes.com/sites/edwardsiedle/2018/02/09/jp-morgan-asset-management-sec-settlement-exposes-hedge-fund-retrocessions.

. . . kickbacks that hedge fund managers make to bankers, brokers and other intermediaries who steer clients their way." These kickbacks "'can ***result in ulterior motives*** driving a bank or wealth manager's decisions to recommend products which are not in their client's best interest.'"[26]  The SEC reported that "[t]he standard retrocession that the broker-dealer affiliate of [JPMorgan] receives from a third-party hedge fund is approximately ***1.0% of the market value of relevant client assets invested***, paid on an annual basis."[27]  As revealed in the SEC Order, JPMorgan unscrupulously requested retrocession payments from third-party hedge fund managers – and took their clients' business money elsewhere if these payments were not forthcoming.

> Beginning in at least 2005, [JPMorgan] sought retrocessions from third-party private hedge fund managers under consideration for inclusion on the Private Bank Platform.  During introductory meetings, third-party hedge fund managers were typically asked about their willingness to pay retrocessions.  If a manager declined to pay retrocessions, an alternative manager with a similar investment strategy that would pay retrocessions was typically sought.[28]

Furthermore, JPMCB consistently failed to disclose this obvious conflict of interest to its clients, admitting that it "did not disclose its preference for retrocession-paying third-party hedge fund managers in IM accounts and GAP IM Holdings until August 2015."[29]  Even if retrocessions were disclosed, they represented clear conflicts of interest that were impermissible for a bank being paid to act in a fiduciary capacity in its clients' best interest.  Moreover, as demonstrated by JPMCB's mismanagement of the Penney Trust, the undisclosed conflicts highlighted in the SEC Order are only a partial consequence of the pervasive misalignment of incentives at JPMorgan, which systematically prioritized its own interests over those of its fiduciary clients.

---

[26] *Id.*
[27] SEC Order ¶ 39.
[28] *Id.* ¶ 40.
[29] *Id.* ¶ 41.

C.     **JPMCB's Self-Dealing Mismanagement of Client Assets Has Dealt Widespread Losses to Ordinary Investors**

34.     Regulators found "significant harm to clients"[30] as a result of the misconduct admitted to by JPMCB and JPMS in the SEC Order – a finding borne out by the injury suffered by the Penney Trust and widespread reports of similar harm done to other JPMorgan clients. Behind the headline findings of the SEC and the CFTC are stories of individual investors whose assets were placed in unsuitable investments based on JPMorgan's misaligned incentives and unseemly practice of self-dealing using client funds.

35.     In 2015, for example, JPMorgan settled a lawsuit brought by an Indianapolis church, endowed by Eli Lilly Jr., which alleged that JPMCB inflicted $13 million in losses on the church's endowment over nine and a half years through its decision "'to purchase over 177 different investment products, mostly from itself, using church funds because they produced the highest revenues to JPMorgan, to the detriment of Christ Church.'"[31]  The fees charged on some of the proprietary products ***exceeded 8 percent per year***: for example, JPMCB invested the church's assets in nearly 90 different structured notes, an alternative investment product linked to stock indices, currencies, and other assets, saddling the church with fees totaling up to 11 percent of the principal value of its investment.[32]  Other endowments, such as ones benefiting the Episcopal Diocese of West Virginia and a public library in Illinois, similarly report that JPMorgan has steered millions of dollars of their assets into loss-making proprietary investments while charging them exorbitant fees for doing so.  Dwindling assets and income from these endowments, caused by JPMorgan's mismanagement, has forced the trust beneficiaries to cut back on aid to charitable

---

[30]  Popper (Dec. 18, 2015).
[31]  Tim Evans, *Christ Church Cathedral claims JPMorgan mismanaged trust funds*, INDYSTAR (Aug. 13, 2014), https://www.indystar.com/story/news/2014/08/13/christ-church-cathedral-claims-jpmorgan-mismanaged-trust-funds/13998197.
[32]  Weinberg (Jan. 9, 2015).

institutions such as a medical center, HIV, hunger, and domestic-abuse programs, a Boy Scout troop, and a soup kitchen.[33]

36.     Besides steering assets into costly, proprietary products at the expense of cost-effective third-party alternatives, JPMCB has invested these clients' trust assets into untested and ultimately catastrophic investments, including the Highbridge Dynamic Commodities Strategy Fund.  This fund opened in 2010, just months after JPMCB's affiliate JPMAMH completed its acquisition of Highbridge, and soon achieved $2.7 billion in assets under management following massive inflows of funds from JPMorgan clients.  One such client was a $24 million trust benefiting a public library in Canton, Illinois, of which JPMorgan trustees invested some $750,000 in the fund at a time when it had *no performance history* and held Morningstar's *lowest rating*. *Bloomberg* reports that JPMorgan later sold the library's stake in this unsuitable product at a *$254,000 loss*.[34]  The Penney Trust was another such client to take significant losses based on its ill-fated investment in the fund, which incurred 17% in cumulative losses before shutting its doors in 2014.[35]  Far from steering clear of any situation where its interests might come into conflict with those of its fiduciary clients, JPMorgan willfully sought to corral trust assets into transactions that enriched the bank at its clients' expense.

37.     JPMorgan's practice of steering client assets into investments that benefited the bank extended to *its own 401(k) savings plan*, which beneficiaries have alleged improperly favored high-cost proprietary products managed by JPMorgan and its allies, with a motive of earning outsized fees, in violation of its  fiduciary duties under the Employee Retirement Income

---

[33] *See id.*
[34] *Id.*
[35] *Id.*

Security Act.[36]  A 2017 news report explained that "[b]y choosing its own mutual funds," among other wrongdoing, "the bank had profited at the expense of its own employees' nest eggs."[37] Besides those allegations, JPMorgan's handling of its 401(k) plan suggests that the bank knew that it was not in the best interests of the plan beneficiaries to invest in JPMorgan's own, higher-cost funds:  as JPMorgan neared a settlement with the SEC and CFTC in late 2015, "some of the most expensive in-house options were jettisoned" from the 401(k) plan's portfolio, a fact that "suggests that *the bank knew it could do better*."[38]  Indeed, Plaintiffs have learned from former JPMorgan financial advisers, including one who was assigned to the Penney Trust, that JPMorgan employees understood that JPMorgan over-invested clients' assets in proprietary products and that the high fees charged on JPMorgan's asset management products exerted a significant "drag" on the performance of its clients' investments.

38.    JPMorgan's self-dealing business practices were not limited to policy preferences for proprietary investment products and retrocession-paying fund managers.  Rather, they reflected a fundamental corruption of incentives within the bank.  Former JPMorgan financial advisers, including one who served the Penney Trust account out of Dallas, have told Plaintiffs that even JPMorgan personnel in fiduciary roles were subject to quotas and variable compensation tied to their volume of new clients, assets, and revenues.  According to these former advisers, JPMorgan began each year at zero along each of these dimensions, driving them to search for assets to place in JPMorgan products and to thereby generate new revenues for the bank.  In addition to being incentivized to prioritize the bank's revenues, these former employees have reported to Plaintiffs

---

[36]  Robert Steyer, *J.P. Morgan faces second suit alleging self-dealing in 401(k) plan*, PENSIONS & INVESTMENTS (Mar. 6, 2017), http://www.pionline.com/article/20170306/ONLINE/170309898/jp-morgan-faces-second-suit-alleging-self-dealing-in-401k-plan.

[37]  Owen Davis, *Here's How Badly JPMorgan Screwed Over Employees Who Have 401(k)s*, DEALBREAKER (Mar. 2, 2017), https://dealbreaker.com/2017/03/jpmorgan-screwed-over-employees-401ks.

[38]  *Id.* (emphasis added).

that JPMorgan's staff was micro-managed by senior personnel to ensure that asset allocations served the bank's interest, corroborating investigative reports by the *New York Times*.[39]  As a result, the former adviser to the Penney Trust reported that JPMorgan employees face ubiquitous conflicts of interest in their role as trustees.  This former employee stated that "we want to act *for* our clients," but that "at JPMorgan we kept doing things *to* our clients."

39.     JPMorgan's culture of self-dealing and incompetence had a broad and pernicious impact on accounts like the Penney Trust.  For example, in October 2012, JPMCB was ordered to pay more than $18 million plus punitive damages and attorney's fees after JPMorgan entered into numerous variable prepaid forward contracts with a trust under its administration.  The court ruled that these transactions improperly benefited JPMorgan at the trust's expense, finding that the resulting fee income for the bank "amounted to double dipping that was inherently unreasonable." The court awarded punitive damages because the bank "has been guilty of reckless disregard for the rights of others."[40]  In certain instances, JPMorgan's mismanagement has apparently been enabled by the incompetence of its personnel.  For example, in 2017, a Texas jury returned a verdict finding JPMCB had breached its fiduciary duties and its agreement to administer the estate of Max D. Hopper.   The bank's mismanagement of Mr. Hopper's estate evinced such disorganization and incompetence that the jury awarded his widow billions of dollars in punitive damages in addition to $4.7 million in actual damages suffered.[41]

---

[39]   Craig & Silver-Greenberg (Mar. 2, 2013).

[40]   Suzanne Barlyn, *JPMorgan must pay $18 million in trust mismanagement case*, REUTERS (Oct. 10, 2012), https://www.reuters.com/article/us-jpmorgan-trustcase/jpmorgan-must-pay-18-million-in-trust-mismanagement-case-idUSBRE8991HF20121010.

[41]   *See* PR Newswire, *Texas Jury Finds JP Morgan Chase Violated Estate Administration Duties and Awards More Than $4 Billion in Punitive Damages* (Sept. 26, 2017), https://www.prnewswire.com/news-releases/texas-jury-finds-jp-morgan-chase-violated-estate-administration-duties-and-awards-more-than-4-billion-in-punitive-damages-300526398.html.

## II.   JPMCB BREACHED ITS FIDUCIARY DUTIES TO PLAINTIFFS AND COMMITTED OTHER WILLFUL WRONGDOING

### A.   JPMCB Failed to Comply with the Prudent Investor Rule

40.     JPMCB's responsibilities as Trustee of the Penney Trust included fiduciary duties to preserve trust property and to invest with reasonable care and competence.  Among other things, JPMCB owed Plaintiffs a duty to comply with the prudent investor rule, which required JPMCB, *inter alia*, to invest and manage its assets in accordance with the prudent investor rule, exercising reasonable care, skill, and caution and pursuing an investment strategy in accordance with risk and return objectives reasonably suited to the portfolio, and to incur costs only to the extent they were appropriate and reasonable.

41.     The distribution requirements and risk and return objectives of the Penney Trust were clearly outlined for JPMCB.  In February 2009, Plaintiff Mary Frances requested that the administration of the Penney Trust be transferred to JPMorgan's offices in Dallas, Texas, in part so that Wagley, her son, could manage the family's relationship with the Trustee.  This new arrangement began with a conference call, early in 2009, during which Wagley and Mary Frances instructed JPMCB to prudently invest to achieve long-term principal growth, and to de-prioritize yearly income.  Wagley repeatedly instructed JPMCB between 2009 and 2015 that it should eliminate high-fee investment products in favor of low-cost, passive index funds, as he reiterated in an e-mail to JPMCB on January 16, 2015:

> As I have mentioned to you in numerous conversations that we have had I would prefer that this money be invested in an S&P index fund or a Vanguard Fund that mirrors the broad market. You are aware that the focus of this Trust for all the folks in my family is to grow the principal.

42.     JPMCB has admitted to Plaintiffs that "JPMorgan's fiduciary obligations include preserving the Trust's wealth while helping achieve Ms. Wagley's goals; namely, seeking real capital growth with secondary goals of generating income and maintaining principal stability over

22

a long time horizon."[42]  JPMCB repeatedly assured and represented to Wagley and other Plaintiffs that it had and would continue to follow the family's investment strategy and stated objectives for the Penney Trust.  For example, JPMC and JPMCB represented in a letter to Plaintiffs' counsel dated November 1, 2016, that "JPMorgan has at all times acted in accordance with those goals and its fiduciary obligations."[43]  However, the performance of the Penney Trust does not bear out JPMorgan's assurances, and it departs so drastically from the performance of market benchmarks as to confirm JPMCB's violation of the most basic standards of prudent investing.

43.    The chart below compares the performance of the Penney Trust with the performance of two comparable accounts, the Brown Advisory Trust and the MIT Penney Chair, from 2000 through 2016.  The chart also shows the performance of the benchmark S&P 500 index from 2009, the year the administration of the Penney Trust was moved to Dallas, Texas (adjusted for the Penney Trust's average annual payout of 1.9% over that period).



---

[42] Letter, Nov. 1, 2016.

[43] *Id.*

Comparing these trusts with one another, and with the benchmark S&P 500 index, is telling because the trusts have similar investment objectives. Yet as demonstrated above, *the Penney Trust has lost principal value* during a time when the stock market has flourished and the Brown Advisory Trust and the MIT Penney Chair have grown by millions of dollars.[44]  The MIT Penney Chair's outperformance is particularly striking given that this trust pays out annual income (rather than re-investing it as principal) at a substantially higher rate than does the Penney Trust.  Notably, the chart above also demonstrates that, had JPMCB done nothing but place the entirety of the Penney Trust assets into S&P 500 index in 2009, the principal value of the Penney Trust would have grown to more than $7.5 million by 2016, even assuming an annual 1.9% distribution of Penney Trust principal.

44.    As described in further detail below, part of the underperformance of the Penney Trust portfolio is explained by JPMCB's deliberate placement of trust assets into costly investment products from which the fee income would improperly inure to JPMCB's benefit and at Plaintiffs' expense.  In other cases, JPMCB managers squandered Penney Trust assets on highly speculative, unsuitable investments that no reasonably prudent investor would have believed to be consistent with the bank's duty to preserve trust property.  For example, in 2013, while the S&P 500 soared by over 32%, JPMCB executed a short-term, speculative trade on a highly leveraged derivative instrument referencing the Hang Seng China Enterprises Index, on which Penney Trust realized a *loss exceeding 26 percent*.  JPMCB also made speculative, leveraged bets on the value of currencies, oil, and other commodities using Penney Trust assets; one of these was unwound in March 2015 at *a short-term loss exceeding 50 percent*.  The inherent leverage of these products makes them unacceptably risky (not to mention costly) for a portfolio with a long-term growth

---

[44]   The MIT Penney Chair values are FYE June 30.

objective, as illustrated by the dramatic loss incurred by the Penney Trust.  These and other imprudent transactions by JPMCB violated both Plaintiffs' directives and the investment objectives of the Penney Trust.

45.     One potential contributing factor to JPMCB's erratic and loss-making trading activity was the constant turnover within the Penney Trust's client service team.  For example, the Penney Trust's fiduciary manager, Dian Kauth, was replaced in July 2010 by Gary Ward.  Mr. Ward was given a new title ("T & E Officer") in December 2011 and was replaced soon after by Jean Davis.  Kelly Adams (**"Adams"**) was assigned as the Penney Trust's T & E Officer in 2014. Similarly, the Penney Trust's portfolio manager, Robert Berry, was replaced in May 2010 by Ryan Lehrke, who by 2012 had been replaced by John Canning, Jr. (**"Canning"**).  JPMCB's continuous overhauling of the team in charge of the Penney Trust resulted in abrupt changes of investment strategy and loss of institutional knowledge that weakened and proved costly to the Trust.

**B.     JPMCB Engaged in Self-Dealing by Investing in Proprietary Funds and Receiving Kickbacks in Return for Investments of Plaintiffs' Property**

46.     JPMCB also owed Plaintiffs a duty of loyalty, a cornerstone of any fiduciary relationship.  This duty, which was not waived in the Trust Agreement, required JPMCB to distance itself from any investments where its interests might be at odds with those of the Penney Trust.  Nevertheless, without disclosure and in violation of its duty to avoid conflicts of interest, JPMCB has consistently steered Penney Trust assets into proprietary funds, putting JPMCB and its affiliates in a position to double-dip on fee income from products a fiduciary would not otherwise have invested in.  These self-interested transactions, which have no place in a fiduciary relationship, reflect the pernicious misalignment of incentives detailed in both the SEC Order and investigative reporting into unacceptable conflicts of interest within JPMorgan.  A former JPMorgan employee who was assigned to the Penney Trust has confirmed to Plaintiffs that the

Trust, contrary to JPMCB's false assurances, fell prey to the pervasive pressure within JPMorgan to sell proprietary products and obtain kickbacks, rather than serve clients' best interests.

        1.      **JPMCB Engaged in Self-Dealing by Investing Penney Trust Assets in Costly and Unsuitable Proprietary Funds**

47.      Like many clients of JPMorgan's far-flung asset management business, Plaintiffs saw the assets of the Penney Trust swept up in JPMorgan's campaign to drive captive clients into its own investment products.  These included two struggling Highbridge funds, the Highbridge Dynamic Commodities Strategy Fund and the Highbridge Statistical Market Neutral Fund, both of which were closed down after JPMCB sold the Penney Trust's positions at a significant loss.

48.      JPMCB invested Penney Trust assets into the Highbridge Statistical Market Neutral Fund on June 20, 2008.  At that time, JPMCB's affiliate JPMAMH held a controlling stake in Highbridge and had recently taken over the Bear Stearns units that provided prime brokerage and custodial services to Highbridge.  Thus, JPMorgan stood to earn revenues from the Penney Trust both as its Trustee and from services provided to the Highbridge funds in which the Penney Trust's assets were placed.  JPMCB never disclosed this conflict of interest, breaching its fiduciary duties to Plaintiffs.  The Penney Trust would come up short in this trade, liquidating its shares in the Highbridge Statistical Market Neutral Fund at a substantial loss in 2010.  JPMorgan subsequently shut down this fund by rolling it into another proprietary fund, following years of lagging performance and a wave of redemptions.[45]

49.      In December 2010, JPMCB invested Penney Trust assets in a newly launched fund, the Highbridge Dynamic Commodities Strategy Fund, which wagered on commodity-linked derivatives with a "long" bias.  JPMCB would not have invested the Penney Trust's property in

---

[45]  Chris Sloley, *JPM rolls market neutral fund into €815m Euro equity strategy*, WEALTH MANAGER (Mar. 18, 2015), http://citywire.co.uk/wealth-manager/news/jpm-rolls-market-neutral-fund-into-815m-euro-equity-strategy/a804243?section=global.

the Highbridge Dynamic Commodities Strategy Fund, a highly speculative product with no track record and Morningstar's lowest rating,[46] had JPMorgan not stood to profit handsomely from attracting assets to the fund.  Yet JPMCB never disclosed this conflict of interest to Plaintiffs, and the fund performed disastrously for Penney Trust and numerous other investors whose funds were funneled into the product by JPMCB trustees.[47]  JPMCB eventually dumped the Penney Trust's interest in the fund for a ***28 percent loss*** to the Trust.

50.    These and other "alternative investments" that JPMCB placed Penney Trust assets in were never suitable investment vehicles for the trust's long-term investment goals.  By investing Penney Trust assets in costly and highly speculative investments to generate fees for itself, JPMCB breached its most fundamental duties of loyalty and competency.  The Highbridge investments introduced clear conflicts of interest into JPMCB's fiduciary relationship with the Penney Trust, but JPMCB failed ***even to disclose*** its conflicts to Plaintiffs, ***let alone*** avoid them.

51.    Besides the Highbridge funds, JPMCB invested the Penney Trust's assets into numerous proprietary funds that are directly managed by or receive other services from JPMCB affiliates, including JPMIM (as investment adviser) and JPMDS (as distributor).  At various times during 2013, for example, the Penney Trust held shares in the JPMorgan Growth Advantage Fund, the JPMorgan U.S. Large Cap Core Plus Fund, the JPMorgan Market Expansion Enhanced Index Fund, the JPMorgan Global Research Enhanced Index Fund, the JPMorgan Strategic Income Opportunities Fund, the JPMorgan Intermediate Tax Free Bond Fund, the JPMorgan Short-Intermediate Municipal Bond Fund, the JPMorgan International Currency Income Fund, the JPMorgan International Value Fund, and the JPMorgan U.S. Real Estate Fund.

---

[46]  Weinberg (Jan. 9, 2015).
[47]  *See id.*

52.     The Trust's investment in the JPMorgan U.S. Large Cap Core Plus Fund was especially suspicious, as that fund's top holdings were ***virtually identical*** to the top holdings in the Trust's portfolio of common stocks.   In effect, the Trust was paying JPMorgan mutual fund management fees merely to duplicate the allocation of the Trust's own securities portfolio – a particularly brazen example of double-dipping.

53.     As JPMCB admitted to the SEC and the CFTC, JPMorgan made and maintained these investments ***without disclosing*** that it systematically preferred these JPMorgan-managed products on the basis of the fees it and its affiliates stood to earn from them.   According to a former JPMorgan employee, JPMCB continued to invest the assets of the Penney Trust in a JPMorgan-managed fixed-income fund even though it ***knew*** that the fund's track record could not justify the higher fees it charged.   In so doing, JPMCB willfully breached its most basic duties of competence and loyalty to Plaintiffs.   Importantly, JPMCB remained in breach of its duties even after federal regulators forced it to disclose its preference for proprietary funds because its placement of Penney Trust assets in such unsuitable, self-interested transactions was no more prudent after it was disclosed to Plaintiffs.

### 2.     JPMCB Engaged in Self-Dealing by Investing Penney Trust Assets in Exchange for Placement Fees

54.     Based on JPMCB's admissions in the SEC Order and other information,[48] JPMCB also engaged in self-dealing transactions using the Penney Trust's funds by making investments in exchange for kickbacks to its broker-dealer affiliates, including JPMS and JPMDS, known as retrocessions or placement agent fees.   JPMorgan's portfolio managers placed the Penney Trust's

---

[48]   That JPMorgan received kickbacks in the form of retrocessions for its placement of Penney Trust funds with hedge funds is highly probable, as "[r]etrocessions amount to approximately half the asset-based fees hedge fund managers charge."   Edward Siedle, *JP Morgan Asset Management SEC Settlement Exposes Hedge Fund Retrocessions*, FORBES (Feb. 9, 2018), https://www.forbes.com/sites/edwardsiedle/2018/02/09/jp-morgan-asset-management-sec-settlement-exposes-hedge-fund-retrocessions/.

fund assets almost exclusively with third-party fund managers that have admitted to the practice of paying retrocessions to intermediaries such as JPMorgan. At the end of 2013, for example, such investments of Penney Trust assets included shares in the Edgewood Growth Fund, the Hartford Capital Appreciation Fund, the ASTON/Fairpointe Mid Cap Fund, the Dodge & Cox International Stock Fund, the Oakmark International Fund, the T. Rowe Price New Asia Fund, the Delaware Emerging Markets Fund, the Neuberger Berman Greater China Equity Fund, the Eaton Vance Floating-Rate Fund, the Eaton Vance Global Macro Absolute Return Fund, the Gateway Fund, the Invesco Balanced-Risk Allocation Fund, the PIMCO Unconstrained Bond Fund, the PIMCO CommoditiesPLUS Strategy Fund, and the DoubleLine Total Return Bond Fund. On information and belief, JPMorgan also received retrocessions for placing Penney Trust assets in complicated investment products known as structured notes.

55. Thanks to disclosures by former JPMorgan employees, Plaintiffs are aware that money managers in JPMorgan's Dallas, Texas office declined to pursue specific investment opportunities on behalf of their clients because third parties refused to pay kickbacks to the bank. One such fund manager, EnCap Investments L.P. (**"EnCap"**), was viewed within JPMorgan as an ideal commodity fund manager, but JPMorgan passed over EnCap because it was unwilling to pay the retrocessions that JPMorgan demanded. In the case of the Penney Trust, JPMorgan instead continued to hold on to failing investments in the same asset class, such as the PIMCO CommoditiesPlus Strategy Fund, before selling the Penney Trust's stake at a ***loss of nearly 45% in November 2015***. Plaintiffs' losses on the PIMCO fund had grown dramatically over the course of 2014 and 2015 – losses that the Penney Trust ***would not have incurred*** had JPMorgan discharged its fiduciary duty to select the best investments for the Penney Trust rather than the most lucrative opportunities for the bank. As disclosed in the SEC Order, the hunt for retrocessions

systematically compromised JPMorgan's investment process and created conflicts of interest with respect to most if not all of the Penney Trust's fund portfolio – facts that JPMorgan inexcusably failed to disclose to the fiduciary clients whose assets were parked in the failed investments based impermissibly on JPMorgan's own self-interest.

56.     Importantly, JPMCB remained in breach of its duties even after federal regulators forced it to disclose its preference for products managed by third parties that shared fees with JPMCB and its affiliate because its placement of Penney Trust assets in such unsuitable, self-interested transactions was no more prudent after it was disclosed to Plaintiffs.

### 3.     JPMCB Traded the Penney Trust's Investments in High Volumes to Generate Additional Fee Income at Plaintiffs' Expense

57.     JPMCB and its affiliates, including JPMS, also stood to gain at Plaintiffs' expense by executing large numbers of trades in order to generate additional fees and commissions from its management of the Penney Trust.   In 2014-2015, for example, JPMCB traded the Penney Trust's assets in volumes far exceeding trades in the Brown Advisory Trust, as shown below:



It is well known in the finance profession that investors "pay a tremendous performance penalty for active trading."[49]  Accordingly, JPMCB's high trading volumes were inimical to the growth of the Penney Trust and the best interests of the Plaintiffs. But, they enriched JPMorgan, which received fees and commissions for trade clearing and execution.  By 'churning' the Penney Trust, JPMCB breached its duties of competence and loyalty to Plaintiffs by prioritizing its own fee income over the long-term growth of the Penney Trust.

C.   **JPMCB's False Representations and Inadequate Disclosures Breached Its Fiduciary Duties to Plaintiffs**

58.   As Trustee of the Penney Trust, JPMCB owed Plaintiffs an affirmative duty to make a full and accurate disclosure of all facts material to their fiduciary relationship – especially any self-dealing transactions or conflicts of interest potentially compromising its activities as Trustee – and to provide a full accounting upon demand.   However, JPMCB routinely and knowingly failed to disclose its conflicts of interest and misled Plaintiffs about its investment process.   Mary Frances, who was 81 years of age at the time the Trust was transferred to JPMorgan's Dallas, Texas office, and the other Plaintiffs were entitled, as JPMCB's longstanding fiduciary clients, to rely on JPMCB's representations that its investment decisions were the process of extensive due diligence and that it would not fail to disclose conflicts of interest.

59.   When Plaintiffs stepped up their efforts to investigate the management of the Penney Trust, JPMCB refused to comply with Plaintiffs' reasonable inquiries regarding the nature of such conflicts and violated its duty of accounting.  Despite the admissions in the SEC Order and the unexplained $188,245.72 in fees JPMCB was forced to admit it wrongly charged the Penney Trust, JPMC has flatly denied any wrongdoing with respect to the Penney Trust and declared that

---

[49]   Brad M. Barber & Terrance Odean, *Trading Is Hazardous to Your Wealth: Common Stock Investment Performance of Individual Investors*, JOURNAL OF FINANCE (Apr. 2000).

it does not need to provide an accounting of the revenue it received by investing Penney Trust assets because no such revenue exists.  Similarly, despite the Plaintiffs' requests for JPMCB to identify all self-interested transactions, the rationale for entering into such self-interested transactions, and the purported "rigorous and ongoing" analysis that JPMCB used to rule out alternative investments, JPMCB has refused to comply with its fiduciary duty to provide full disclosure.

### 1.      JPMCB Failed to Disclose Its Conflicts of Interest

60.      As detailed in the SEC Order, JPMCB and JPMS systematically preferred their own proprietary mutual funds and hedge funds when trading on behalf of discretionary accounts like the Penney Trust – and at the direction of JPMC, failed to disclose this material fact to Plaintiffs and its other clients.  For example, the 2013 annual account statement for the Penney Trust makes ***no mention of any preference*** for proprietary investments, even though it was both the practice of the bank to prefer such investments, and its duty to specifically disclose them to Plaintiffs.  JPMCB and JPMS knew that this omission was misleading at the time it was made, since it was the explicit preference of the bank, as determined by JPMCB's and JPMS's corporate parent, JPMC, to steer client assets into assets that generated additional revenues for JPMorgan.

61.      While the 2014 and 2015 annual account statements belatedly and vaguely refer to a "general" preference for "J.P. Morgan managed strategies," even these admissions did not disclose the extent of JPMCB's self-dealing.  For example, the Trust's 2014 account statement asserts that JPMorgan "prefer[s] internally managed strategies because they generally align well with our forward looking views and our familiarity with the investment processes, as well as the risk and compliance philosophy that comes from being part of the same firm."  However, the disclosure also represents that JPMorgan would prefer third-party strategies whenever they "offer substantially differentiated portfolio construction benefits."  Accordingly, it states that "the

proportion of J.P. Morgan managed strategies will be high" only in asset classes "such as, for example, cash and high-quality fixed income," where such differentiated benefits are unlikely.

62.     These statements were materially misleading when made because JPMorgan knew that it preferred (and pushed and incentivized its financial advisers to prefer) proprietary investments, even where third-party strategies offered clear, "differentiated" benefits (such as lower cost) to JPMorgan's clients.   Indeed, the language in JPMCB's 2015 account statement confirms the falsity of the disclosures in its 2014 account statement, as it acknowledges that the bank preferred JPMorgan-managed strategies without the qualification, which appeared in the 2014 version, "unless we think third-party managers offer substantially differentiated portfolio construction benefits."   In fact, JPMorgan routinely preferred proprietary funds *even where* third parties offered superior investment options to JPMCB's fiduciary clients because such proprietary investments allowed it (through entities such as JPMIM and JPMDS) to earn more money from its clients.

63.     JPMCB also routinely invested trust assets into third-party funds that offered its affiliates, such as JPMS and JPMDS, retrocessions without disclosing to clients that it faced a conflict of interest in such situations – let alone that it systematically preferred retrocession-paying fund managers.   For example, the annual account statements JPMCB provided to the Penney Trust beneficiaries in 2013 makes no mention of retrocessions at all.   The annual account statement for 2014 states only that "[c]onflicts *may* result, for example . . . when J. P. Morgan receives payment as a result of purchasing an investment product for a client's account" (emphasis added), but fails to disclose that JPMorgan actively preferred such investments and to specifically identify such conflicts.   Even the 2015 disclosure, which admits that "[c]onflicts *will* result" (emphasis added) under such circumstances, fails to specifically identify the conflicted transactions executed on the

Penney Trust's behalf and misleadingly omits the fact that JPMorgan attempted systematically to allocate its clients' portfolios to fund managers who would provide kickback payments.

64.     JPMCB also mischaracterized its investment process even as it breached its duties of competence and care.  In 2014, JPMCB's annual account statement for the Penney Trust represented that "[p]rospective investment strategies are carefully selected from both J.P. Morgan and third-party asset managers across the industry and are subject to a rigorous and ongoing review process that is consistently applied by our manager research teams."  Yet the bank's 2015 disclosure all but admits to the falsity of this representation, stating that JPMorgan's investment strategies are merely "subject to *a* review process" (emphasis added).  In fact, JPMorgan did ***not*** apply a rigorous or consistent review process to ensure that its self-interested transactions were truly in the best interests of its clients.  But while JPMCB's belated disclosures begin to shed light on the gravity and pervasiveness of its self-dealing and mismanagement, they were too little, too late to make Plaintiffs aware of the misaligned incentives that corrupted JPMorgan's investment process and underlay its failed investment strategy for the Penney Trust.

### 2.     JPMCB Stonewalled Plaintiffs' Requests for Information and Violated Its Duties of Full Disclosure and Accounting

65.     In addition to misleading Plaintiffs about the bank's investment process for the Penney Trust, JPMCB breached its obligations of disclosure and accounting once confronted with Plaintiffs' reasonable requests for information about the performance of the Trust.  In response to Wagley's January 16, 2015 e-mail requesting information on the performance of and fees paid by the Trust, Adams, the T & E Officer, misleadingly provided only a "breakdown of account administrative fees" for the period requested.  This was no more than an evasion on JPMCB's part, since such administrative fees necessarily excluded "any fees that [JPMorgan] has obtained in regards to investing in Funds or trading individual stocks" on the Penney Trust's behalf, as

34

requested in Wagley's e-mail.  Meanwhile, Adams failed to disclose the $188,245.72 in additional fees that JPMCB improperly charged to the Penney Trust.  Wagley responded by requesting a more fulsome accounting for any fees paid by the Penney Trust, but JPMCB responded with protracted periods of silence and failed to satisfactorily resolve these requests, often providing incomplete or irrelevant documentation in response to Wagley's requests.

66.     As a result, in the summer of 2015, Wagley requested that JPMCB personnel meet with him and Mary Frances to discuss the family's growing concerns about the management of the Penney Trust.  Due to both the serious nature of the concerns, and the high degree of turnover among the Penney Trust's management team, Wagley specifically requested that both Canning and Elaine Agather (**"Agather"**), the Chairman of JPMC's Dallas region and South and Midwest Region Head at J.P. Morgan Private Bank, be present at the meeting. Canning agreed and scheduled the meeting to accommodate both his schedule and Agather's.  Plaintiff Mary Frances flew to Dallas to join her son at the meeting, only to learn that Agather would not attend because she was in Italy at the time.  Instead, the sole attendees representing JPMorgan were Canning and his colleague Matt Smith (**"Smith"**).  At the meeting, JPMCB represented that it had done an excellent job as Trustee of the Penney Trust, and failed to acknowledge the self-dealing that was responsible for the Trust's poor performance.

67.     Wagley requested another meeting the following year, along with an accounting for any and all payments (including placement fees) that JPMorgan earned from the use, trading and investment of funds from the Penney Trust.  JPMorgan agreed to schedule the meeting on June 9, 2016. The meeting was attended by Agather, Canning, Adams, and Smith, along with Plaintiffs Wagley, Anne Wagley, and Mary Copp.  Agather apologized for the performance of the Trust, which she admitted was ***"disturbing,"*** but again failed to admit any wrongdoing – even though

admissions of wrongdoing by JPMCB and JPMS had by that time been made public by the SEC Order.  JPMCB's representatives also rejected Plaintiffs' request for an accounting.

68.     Discouraged, but hopeful of resolving Plaintiffs' concerns without resorting to litigation, Plaintiffs followed up with a demand letter, dated September 1, 2016 (the **"Demand Letter"**), that formally requested that JPMorgan disclose any fees or benefits received by the bank in connection with the management of the Penney Trust, as well as a full accounting for all self-interested investments JPMorgan made on the Penney Trust's behalf.

69.     After two months and multiple requests for additional time to gather the requested documents, JPMCB and JPMC finally responded to the Demand Letter on November 1, 2016.  The response was threadbare, consisting only of: a general publication authored by JPMC describing its benchmarking philosophy; a schedule showing the expense ratios of investments in the Penney Trust; and copies of account statements from 2005 to the present.  Thus, JPMCB continued to breach its obligation to account to Plaintiffs and provide a full disclosure of its conflicted transactions, including by providing the requested documentation showing the fees, including placement fees, and other revenues it received by investing the Penney Trust assets.  Instead, JPMC and JPMCB affirmatively misrepresented that ***"[JPMCB] did not make 'self-interested' investments with Trust funds"*** and that "there are no fees to identify," in part because JPMCB purportedly "offset the management and other fees paid to [JPMCB] affiliates for [proprietary] mutual funds against the trustee's fee."[50]  JPMCB likewise brushed aside questions about trading commissions by representing that, "[g]enerally, [JPMCB] does not collect a commission for trades made on behalf of the Trust."[51]  This vague statement did not come close to adequately accounting for any trade commissions that JPMCB and its affiliates ***did*** collect and was misleading in light of

---

[50]  Letter, Nov. 1, 2016 (emphasis added).

[51]  *Id.*

JPMCB's admissions in the 2014 and 2015 account statements that it charges accounts for "trade execution and trade clearing."

70.     Plaintiffs again wrote to JPMCB to identify various inconsistences and gaps in JPMorgan's response.  This second demand letter (the **"Second Demand Letter"**) again requested JPMCB answer the questions posed in the Demand Letter, this time by January 17, 2017.  JPMCB ignored the Plaintiffs' requests for information contained within the Second Demand Letter and never contacted Plaintiffs' counsel with any questions or concerns about the information requested. Instead, the only further communication from JPMCB was a petition to withdraw as Trustee filed in Surrogate's Court for Monroe County, New York.[52]  The Withdrawal Petition also requests that the court discharge JPMCB "from any liability as Successor Trustee of the trust."

71.     As noted above, shortly after JPMCB filed the Withdrawal Petition, Adams sent Mary Frances a letter disclosing, without any explanation, that JPMCB had improperly overcharged the Penney Trust $188,245.72 in fees.  Remarkably, Adams copied neither the counsel that JPMCB and JPMC *knew* represented Mary Frances nor the son (Wagley) that JPMCB knew had become the preferred point of contact for Mary Frances.  Instead, Adams sent the letter directly and exclusively to the 89-year-old beneficiary of the Penney Trust. Adams' letter offered only one ambiguous sentence of explanation. The letter's vague description of the "incorrectly charged fees" is indisputably inadequate and is tantamount to an admission that, despite its prior representations to the contrary, JPMCB has inappropriately charged fees to the Penney Trust and treated its assets as it would treat an ordinary account — rather than as a fiduciary.  No further details were given when Adams and JPMCB mailed Mary Frances the check that included the adjustment for the overcharged fees.  That JPMCB discovered these "incorrectly charged fees"

---

[52] *See* Petition for Judicial Settlement of Intermediate Account of Trustee, Resignation of Trustee and Discharge of Trustee (N.Y. Surrogate's Ct. Jan. 13, 2017) (the "**Withdrawal Petition**").

only after petitioning to terminate its trusteeship and requesting a release from liability is indicative of how utterly it failed to discharge its duties as Plaintiffs' fiduciary.

### D. JPMCB's Breach of its Fiduciary Duty, Self-Dealing, and Imprudent Investing Injured Plaintiffs

72.     As described above, JPMCB's breach of fiduciary duty, self-dealing and imprudent investment strategy resulted in damages to the Penney Trust, including but not limited to: (1) inhibiting the growth of the Penney Trust; (2) actual losses to the Penney Trust principal value; and (3) at least $188,245.72 in improper, unexplained charges to the Penney Trust.

73.     The Penney Trust's underperformance relative to benchmarks such as the S&P 500 and the Brown Advisory Trust is indicative.  As noted, while the Penney Trust was about $800,000 more valuable than the Brown Advisory Trust in 1995, by mid-2018, as a result of JPMorgan's systematic mismanagement, the value of the Penney Trust had fallen behind the Brown Advisory Trust by *approximately $8 million*.  The Penney Trust is but one of the numerous accounts that have been injured by JPMorgan's pervasive practice of misusing captive clients' assets for its own benefit.

## III.   PLAINTIFFS' CLAIMS ARE TIMELY

### A.   No Limitations Period Can Begin Until JPMCB's Removal as Trustee

74.     The Trust Agreement is a continuing contract under which JPMCB manages the Penney Trust until JPMCB is terminated as Trustee.  In addition, JPMCB's misconduct perpetrated a continuing wrong that has caused ongoing injury to Plaintiffs until JPMCB's last wrongful act.  Thus, JPMCB's continuous mismanagement of the Penney Trust over a period of years has generated an accumulating shortfall between the total returns of the Penney Trust and the benchmark returns of funds managed in a manner consistent with JPMCB's fiduciary duties.

These facts require the tolling of any otherwise-applicable statute of limitations until, at the very earliest, JPMCB's removal from Trusteeship of the Penney Trust.

      **B.**      <u>**Inquiry Notice, Equitable Tolling, and Fraudulent Concealment**</u>

      75.      Plaintiffs have had a longstanding fiduciary relationship with JPMCB and were entitled to rely on the bank's assurances that the underperformance of the Penney Trust was due to market factors rather than any improper behavior by JPMCB.  As described above, JPMCB's account documentation never adequately disclosed the conflicts of interest that corrupted the bank's investment process, which did not come to light until the publication of the SEC Order on December 18, 2015.  As such, Plaintiffs were not on inquiry notice of their claims before December 18, 2015; Plaintiffs brought suit in Texas state court on February 20, 2017, well within two years of this date.

      76.      However, even on December 18, 2015, Plaintiffs could not with reasonable diligence have discovered their claims because of JPMCB's continuing fraudulent concealment. When Plaintiffs inquired about possible conflicts at JPMCB in their June 9, 2016 presentation and subsequent Demand Letter, JPMorgan ***affirmatively denied*** any improper behavior, insisting on November 1, 2016 that ***"JPMorgan did not make 'self-interested' investments with Trust funds."***[53]  JPMCB's concealment of its wrongdoing would prove to be fraudulent when, in January 2017, JPMCB admitted that it had overcharged the Penney Trust and pleaded for a release from liability.  JPMCB's fraudulent concealment, perpetrated from a position of trust and confidence as Plaintiffs' fiduciary,  prevented Plaintiffs from discovering their claims and tolled any applicable statute of limitations.

---

[53]  Letter from Wook Kim, Esq. to G. Michael Gruber, Esq., Nov. 1, 2016 (emphasis added).

77.     Equitable tolling is further justified here by Plaintiffs' **_extraordinary_** exercise of diligence in investigating and prosecuting their claims.  Led by Wagley, Plaintiffs met regularly with the Trust's team at JPMCB and routinely reviewed the Trust's monthly account statements to understand the construction of the portfolio in relation to the Trust's growth objectives.  In numerous ways, Plaintiffs went far beyond the call of duty for beneficiaries of a discretionary trust account.

78.     For example, in 2014, concerned by the Penney Trust's poor performance, Wagley set up a meeting with JPMCB representatives in March of 2014.  There, Wagley reiterated the family's request that the Penney Trust assets be invested in low-cost index funds.  Months later, Wagley again reached out to JPMCB on January 16, 2015.  He wrote:

> I would like to look at the performance of the Trust over the last ten years.  In addition to performance I would like to look at fees that JP Morgan has received from managing this trust.  Also will you please disclose any fees that JP Morgan has obtained in regards to investing in Funds and or trading individual stocks.

Following their additional requests for information, Plaintiffs went so far as to prepare a forty-nine page PowerPoint presentation that they showed to JPMorgan executives on June 9, 2016.  Among other things, the presentation provided an extraordinarily detailed outline of the Trust's history and purpose; a rigorous comparison of the performance of the Penney Trust with that of the Brown Advisory Trust and other portfolios and market benchmarks; and detailed inquiries into the nature of various fees and the rationale behind the Trust's investments in various hedge funds, commodities funds, structured products, and proprietary mutual funds.  Having demonstrated the falsity of JPMCB's representations, Plaintiffs called upon JPMCB to step down as Trustee of the Penney Trust – a step they would have taken years earlier had JPMCB not falsely assured them and fraudulently omitted to disclose the corruption of its investment process.

79.     Plaintiffs' diligence was especially laudable given that they were passive beneficiaries of a discretionary account, which JPMCB managed as their fiduciary.  JPMC and JPMCB flatly denied any wrongdoing in its November 1, 2016 reply to Plaintiffs' Demand Letter. Belying this denial, JPMCB later admitted to Mary Frances on January 20, 2017 that the bank had improperly overcharged the Trust by $188,245.72. Plaintiffs filed a petition in Texas state court alleging breach of fiduciary duty and requesting an accounting *just 18 days later*, on February 20, 2017.[54]  Even though Plaintiffs, including the now 91-year-old Mary Frances, were entitled to rely on JPMCB's representations as their longstanding fiduciary, they wasted no time in diligently investigating the performance of the Trust, raising their concerns with JPMCB, repeatedly seeking further information in meetings, e-mails, and successive demand letters, and sought judicial relief the moment it became clear further discussions with JPMCB were futile.  For these reasons, any statute of limitations affecting or limiting the rights of action by Plaintiffs was equitably tolled.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty Against JPMCB)

80.     Plaintiffs re-allege each allegation above as if fully set forth herein.

81.     As Trustee of the Penney Trust, JPMCB owed fiduciary duties to Plaintiffs, as beneficiaries of the Penney Trust.

82.     JPMCB owed Plaintiffs duties to comply with all lawful instructions received from Plaintiffs and to act loyally for Plaintiffs' benefit in all matters connected with the management of the Penney Trust.

---

[54]  Plaintiffs filed this action in the Supreme Court for the State of New York on Friday, September 14, 2018, and the court issued an index number on Monday, September 17, 2018, whereupon service upon JPMCB was effected the same day.  Pursuant to Section 25-a(1) of New York's General Construction Law, this action was commenced within six months after the termination of the prior action filed in Texas state court on March 15, 2018.  Accordingly, the statute of limitations was tolled by the filing of the prior action pursuant to CPLR § 205(a).

83.   JPMCB has breached these duties by:

   a.   failing to follow the agreed-upon investment strategy;

   b.   investing Penney Trust assets in self-interested transactions, including but not limited to investment products managed by JPMCB affiliates, in order to earn additional revenues and other advantages for itself and its affiliates, including JPMIM and JPMDS;

   c.   upon information and belief, investing Penney Trust assets in investment products managed by third parties that shared client fees with JPMCB and/or its affiliates, including JPMS and JPMDS;

   d.   upon information and belief, investing the Penney Trust assets in unsuitable products and securities, including investment products managed by Highbridge, to artificially prop up such funds' assets under management and produce more revenue for JPMCB and its affiliates; and

   e.   executing a high volume of trades in a manner inconsistent with the objectives of the Penney Trust while generating additional commissions and other fees for JPMCB and its affiliates.

84.   JPMCB knowingly undertook the foregoing actions with the motive of serving its own interests at the expense of the best interests of Plaintiffs.

85.   JPMCB owed Plaintiffs a duty to act with the care, competence, and diligence normally exercised by trustees in similar circumstances, and to incur costs only to the extent they are appropriate and reasonable.

86.   JPMCB has breached its duties to exercise care, competence, and diligence, and to invest as a prudent investor.  Instead of investing in growth-oriented funds with low expense ratios,

JPMCB has funneled Penney Trust assets into an unbalanced portfolio of alternative, risky, and exotic investments to the detriment of the Penney Trust and its objective of principal growth. JPMCB has placed Trust assets into investment strategies that are unsuitable for the Trust's investment objectives, and has enriched JPMCB and its affiliates while dissipating the value of the Trust.

87.     JPMCB owed Plaintiffs duties to keep and render accounts to Plaintiffs and to use reasonable effort to provide Plaintiffs with facts that JPMCB knew, had reason to know, or should have known Plaintiffs would wish to know or that were material to JPMCB's duties to Plaintiffs.

88.     JPMCB breached its duties of full disclosure by failing to comply with repeated requests by Plaintiffs, and their representatives, to fully disclose all benefits JPMCB and its affiliates had gained by acting as the Trustee of the Penney Trust.  Such requests for disclosure include: requests for rationale behind certain investments; requests for an accounting of all fees, including placement fees and retrocessions, and revenue JPMCB and its affiliates have received as a result of JPMCB's Trusteeship of the Penney Trust; and requests for identification of all self-interested investments.

89.     With respect to the securities of any investment company or trust served by JPMCB or its affiliates, JPMCB was required to elect annually whether (i) to receive or have its affiliate receive compensation for providing such services to such investment company or trust for the portion of the Penney Trust invested in such investment company or trust or (ii) to take annual corporate trustees' commissions with respect to such portion, but was not permitted to receive compensation in both of the foregoing forms.

90.     On information and belief, JPMCB breached the foregoing by receiving (or having its affiliates receive) compensation for providing services to investment companies and/or trusts

in the securities of which JPMCB invested Penney Trust funds. Services for which JPMCB or its affiliates were improperly compensated include, without limitation, JPMS's services as placement agent for third-party funds, JPMIM's services as investment adviser to certain proprietary funds, and JPMDS's services as distributor to certain investment products.

91.    As a direct, proximate, and foreseeable result of JPMCB's breaches of its fiduciary duties, Plaintiffs have been injured and suffered damages, while JPMCB and its affiliates have benefitted.

92.    JPMCB and its affiliates should be ordered to disgorge, and Plaintiffs are entitled to recover, all commissions, fees, gains, profits, revenues, and other advantages JPMCB and its affiliates, including without limitation JPMC, JPMS, JPMIM, and JPMDS, have gained directly or indirectly through JPMCB's position as Trustee of the Penney Trust.

93.    On information and belief, JPMCB's breach of its fiduciary duties to Plaintiffs formed part of a pattern of egregious misconduct directed at the public at large, warranting an award of punitive damages to Plaintiffs.

## SECOND CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty Against JPMC and Kelly Adams)**

94.    Plaintiffs re-allege each allegation above as if fully set forth herein.

95.    As Trustee of the Penney Trust, JPMCB owed fiduciary duties to Plaintiffs, as beneficiaries of the Penney Trust.

96.    JPMC knowingly participated in and aided and abetted JPMCB's breaches of fiduciary duty. As the publicly traded parent company of JPMCB and the affiliated entities that earned revenues and other advantages as a result of JPMCB's administration of the Penney Trust, JPMC had knowledge of the fiduciary relationship between JPMCB and the beneficiaries of the Penney Trust and had knowledge that JPMCB's conduct constituted breaches of its fiduciary duties

to Plaintiffs.  JPMC intended to assist and encourage JPMCB in committing its breaches of fiduciary duties of loyalty, care, competence, diligence, accounting, and full disclosure to Plaintiffs by instructing its subsidiaries, including JPMCB and JPMS, to systematically steer Plaintiffs' trust assets into proprietary investment products managed by JPMC subsidiaries or third parties that shared client fees with JPMC subsidiaries without disclosing either this practice or the benefits JPMC subsidiaries received therefrom to Plaintiffs.

97.     JPMC intentionally assisted and encouraged JPMCB in committing its breaches of fiduciary duties of loyalty, care, competence, and diligence to Plaintiffs by establishing employee compensation systems, transfer pricing, software tools, policies and procedures, and other practices to assist and encourage JPMCB to place Penney Trust assets into transactions in which JPMC and its subsidiaries stood to earn revenues.

98.     JPMC further intentionally assisted and encouraged JPMCB in committing its breaches of fiduciary duties of accounting and full disclosure to Plaintiffs by making knowingly false statements (and directing JPMCB to make knowingly false statements) to Plaintiffs in response to their reasonable requests for information.  For example, in a letter to Plaintiffs dated November 1, 2016, JPMC's Vice President and Assistant General Counsel Wook Kim assisted JPMCB in fraudulently concealing its wrongdoing by knowingly misrepresenting that "JPMorgan did not make 'self-interested' investments with Trust funds."

99.     Adams knowingly participated in and aided and abetted JPMCB's breaches of fiduciary duty.  As the T & E Officer in charge of administering the Penney Trust, Adams had knowledge of the fiduciary relationship between JPMCB and the beneficiaries of the Penney Trust and had knowledge that JPMCB's conduct constituted breaches of its fiduciary duties to Plaintiffs. Adams intended to assist JPMCB in committing its breaches of fiduciary duties of disclosure to

Plaintiffs and gave JPMCB such assistance and encouragement by failing to disclose information requested by the beneficiaries, including the amount of fees JPMCB and its affiliates received as a result of JPMCB's role as Trustee of the Penney Trust and the amount of fees charged by JPMCB and its affiliates to the Penney Trust.

100.    Adams' assistance and encouragement were substantial factors in causing JPMCB's breaches of fiduciary duty.  Adams' conduct proximately and directly caused harm to Plaintiffs and resulted in benefits to JPMCB and its affiliates by, among other things, inducing Plaintiffs to seek removal of JPMCB as Trustee of the Penney Trust.

101.    On information and belief, JPMC's aiding and abetting of JPMCB's breaches of its fiduciary duties to Plaintiffs formed part of a pattern of egregious misconduct directed at the public at large, warranting an award of punitive damages to Plaintiffs.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment and Restitution Against JPMIM, JPMS, and JPMDS)

102.    Plaintiffs re-allege each allegation above as if fully set forth herein.

103.    JPMIM has benefited from and been enriched by Defendants' unlawful conduct, including by receiving fees as investment adviser, administrator, and provider of administrative services for mutual funds in which JPMCB placed Penney Trust assets.

104.    JPMS has benefited from and been enriched by Defendants' unlawful conduct, including by receiving fees and commissions for trading and execution and receiving retrocessions in exchange for the placement of Penney Trust assets in investment products.

105.    JPMDS has benefited from and been enriched by Defendants' unlawful conduct, including by receiving fees as the shareholder servicing agent and distributor of mutual funds in which Defendants placed Penney Trust assets, and by receiving retrocessions in exchange for the placement of Penney Trust assets in investment products.

46

106.     The role of JPMIM, JPMS, and JPMDS in the management of the Penney Trust conferred no wrongful or uncompensated benefit on Plaintiffs, who paid annual trust management fees to JPMCB, but injured and damaged Plaintiffs by inhibiting the growth and diminishing the principal value of the Penney Trust.

107.     JPMIM, JPMS, and JPMDS extracted a windfall at the expense and detriment of Plaintiffs, which was unlawful under Section 11-2.3(d) of New York's Estates, Powers & Trusts Law , and equity and good conscience require that they make restitution to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

a.     Compensatory damages in an amount to be determined at trial;

b.     An order directing JPMCB to fully account for all gains, profits, and other advantages, including the fees, retrocessions, and other revenues described herein, that it and its affiliates derived from its wrongful acts and omissions;

c.     Forfeiture of fees that JPMCB received for its activities as a faithless servant of the Penney Trust;

d.     Disgorgement of all such gains, profits, and other advantages received by Defendants as a result of the breaches of fiduciary duties described herein;

e.     Attorneys' fees and costs;

f.     Prejudgment interest at the maximum legal rate; and

g.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:   New York, New York
         October 22, 2018

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:   */s/ Andrew J. Rossman*
      _____

      Andrew J. Rossman
      Alex Spiro
      Nathan Goralnik

      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      Telephone: (212) 849-7000
      Facsimile: (212) 849-7100

      andrewrossman@quinnemanuel.com
      alexspiro@quinnemanuel.com
      nathangoralnik@quinnemanuel.com

48